FILED
SUPERIOR COURT
OF GUAM

2022 DEC -2 PM 4: 24

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| DUANE PAUL DIEGO, <br><br> Petitioner, <br><br> vs. <br><br> ROBERT D. CAMACHO, Director, Guam Department of Corrections, <br><br> Respondent. | SPECIAL PROCEEDINGS CASE NO. SP0110-17 <br><br> **DECISION AND ORDER** |

## INTRODUCTION

This matter came before the Honorable Vernon P. Perez on June 27, 2022, for hearing on Plaintiff Duane Paul Diego's ("Petitioner") Amended Petition for Writ of Habeas Corpus. Present were Diego with counsel, Joshua D. Walsh, and Assistant Attorney General Marianne Woloshuk on behalf of Respondent Robert D. Camacho, Director, Guam Department of Corrections ("Respondent").[1] Having reviewed the pleadings, the arguments presented, and the record,[2] the Court now issues the following Decision and Order.

---

[1]  At the time of Petitioner's original Petition for Writ of Habeas Corpus, Alberto T. Lamorena V was the Director of the Guam Department of Corrections. On July 1, 2022, Respondent filed a Notice of Automatic Substitution of Public Officer Party-Successor, substituting Robert D. Camacho for Joseph Carbullido, in his official capacity as Director of the Guam Department of Corrections.

[2]  On November 5, 2021, Petitioner's Excerpts of Record and Supplemental Excerpts of Record were filed. On January 6, 2022, Respondent's Unopposed Motion for Judicial Notice was filed, attaching relevant transcripts from the underlying trial in Superior Court of Guam Criminal Case No. CF0398-07.

*Diego vs. Camacho*
SP0110-17
Decision and Order

# BACKGROUND

In *People v. Diego,* Superior Court of Guam Case No. CF0398-07, Petitioner was convicted by a jury of his peers of the First Charge of First Degree Criminal Sexual Conduct (As a First Degree Felony) – Counts One, Two, and Four; the Second Charge of Second Degree Criminal Sexual Conduct (As a First Degree Felony) – Counts One, Two, and Four; the Third Charge of Third Degree Criminal Sexual Conduct (As a Second Degree Felony) – Counts One, Two, and Four; the Fourth Charge of Assault with Intent to Commit Criminal Sexual Conduct (As a Third Degree Felony); the Fifth Charge of Kidnapping (As a Second Degree Felony); the charge of Unlawful Restraint (As a Misdemeanor), *as a lesser-included offense* of the Sixth Charge of Felonious Restraint (As a Third Degree Felony); and the Seventh Charge of Terrorizing (As a Third Degree Felony). No motions *in limine* were filed prior to trial. Petitioner was sentenced to twenty (20) years of imprisonment for the First Charge of First Degree Criminal Sexual Conduct (As a First Degree Felony). *See* Judgment, Jun. 11, 2012.[3] Petitioner was represented during trial and sentencing by Assistant Alternate Public Defender Jeffrey L. Warfield, Sr.[4]

Petitioner subsequently appealed and the Supreme Court of Guam affirmed the Judgment. *People v. Diego,* 2013 Guam 15. The Supreme Court addressed the following issues: (1) the victim's out-of-court identification via photo array, finding that the photo array was not impermissibly suggestive (2013 Guam 15 ¶¶ 11-21); (2) the kidnapping jury instruction, finding that the instruction contained no error (2013 Guam 15 ¶¶ 22-28); and (3) Petitioner's Motion for Acquittal, finding that the trial court's denial was proper because a rational trier of fact could have found the essential elements of the charged crimes beyond a reasonable doubt (2013 Guam 15 ¶¶ 29-38).

---

[3] The Court acknowledges as set forth by Petitioner in his Amended Petition that the Judgment contains errors. The Judgment reflects that the jury returned a verdict of GUILTY of all charges set forth in the Indictment filed on August 31, 2007.

[4] Petitioner was initially represented by the Public Defender Services Corporation ("PDSC") in CF0398-07. PDSC withdrew from representation of Petitioner on January 31, 2008 due to a concurrent conflict of interest, and Alternate Public Defender was appointed as Petitioner's new counsel of record.

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 2 of 15

On August 4, 2017, Petitioner filed a Petition for Writ of Habeas Corpus, alleging ineffective assistance of counsel during trial and on appeal. *See generally,* Pet., Aug. 4, 2017. On August 31, 2017, Petitioner filed a Motion for Appointment of Counsel. The Court subsequently granted the Motion and appointed Leslie Travis as counsel for Petitioner.[5] *See* Dec. & Order, Jan. 23, 2018; Notice of Court Appointed Counsel, May 21, 2018. On July 30, 2020, the Court appointed Attorney Joshua D. Walsh to represent Petitioner. (Order Granting Mot. Withdraw and Appointing New Counsel, Sep. 28, 2020). The matter was continued through several status hearings to provide counsel time to meet with Petitioner to prepare his Amended Petition.

On November 5, 2021, Petitioner filed his Amended Petition for Writ of Habeas Corpus.

On January 5, 2022, Respondent filed his Brief in Opposition to the Amended Petition.

On April 1, 2022, Petitioner filed his Reply.

On June 27, 2022, the Court heard oral arguments on the Amended Petition and subsequently placed the matter under advisement.

## DISCUSSION

Petitioner seeks for habeas corpus relief based on ineffective assistance of counsel both pre-trial and during trial. *See generally,* Am. Petition, Nov. 5, 2021. Petitioner asserts that his trial counsel was ineffective because (1) he failed to move to exclude an unduly suggestive photo lineup; (2) he failed to request a jury instruction regarding eyewitness testimony and offer arguments regarding the inherent susceptibility of cross-racial identifications; and (3) he failed to request a jury instruction regarding the rape crisis center physician's impermissible vouching for the complaining witness. *Id.* at 24 – 36. Respondent opposes, arguing that the habeas petition is untimely and that Petitioner did not suffer ineffective assistance of counsel entitling him to habeas relief. *See generally,* Resp. Opp'n Brief, Jan. 5, 2022.

---

[5] Prior to the appointment of Attorney Leslie Travis as counsel for Petitioner, the Court had appointed Attorneys Patrick Wolff and Ray Haddock and subsequently granted their requests to withdraw. *See* Withdrawal from Case and Order (Attorney Wolff), Feb. 8, 2018; Mot. & Order to Withdraw (Attorney Haddock), Jun. 7, 2018.

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 3 of 15

## I.     Timeliness

The Court will first address Respondent's argument that the Amended Petition should be denied based on untimeliness.  Respondent argues that the Amended Petition should be dismissed under the *Ignacio-Clark* standard for reasonable delay because the initial Petition was dated June 28, 2017 and stamp filed August 4, 2017, "nearly four years after the Guam Supreme Court issued its judgment on August 15, 2013." (Opp'n at 14, Jan. 5, 2022).  Petitioner opposes, arguing that Respondent's "reliance upon *Ignacio* is misplaced" because "[t]he appellant in *Ignacio* was compelled to justify his delay in bringing a writ petition 'because **nearly thirty years had elapsed** since Ignacio's criminal appeal was denied." (Reply at 3, Apr. 1, 2022) (emphasis in original).

In *Ignacio v. People*, 2012 Guam 14, the Supreme Court of Guam declined to "adopt the general four-year statute of limitation for civil actions as a strict guideline for habeas actions," noting that "for certain extreme circumstances, it would be inappropriate to impose a strict four-year statute of limitations on a habeas corpus petition.  Indeed, the habeas corpus petition is not a convention 'cause of action' that would provide a clear, definitive time of initial accrual." 2012 Guam 14 ¶¶ 12-13.  Instead, the Supreme Court adopted a "reasonable delay standard from California's *In re Clark* for the purposes of determining what justifies a significant delay in a petition for writ of habeas corpus." 2012 Guam 14 ¶ 15.  In light of this, the Court declines to find that the period of four years between when Petitioner's appeal was resolved in 2013 to when he filed the initial Petition in 2017 to be a significant delay thereby requiring justification in seeking relief.

## II.     Ineffective Assistance of Counsel

The Court next turns to Petitioner's arguments that his right to effective counsel pre-trial and during trial was violated.  A defendant's right to effective assistance of counsel derives from the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. "The Sixth Amendment right to counsel is the right to have effective assistance of counsel." *People v. Meseral*, 2014 Guam 13 ¶ 44 (quoting *Strickland v. Washington*, 466 U.S. 668, 686

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 4 of 15

(1984)). Petitioner bears the burden of proof to demonstrate that his trial counsel was constitutionally inadequate. *See Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992).

Under *Strickland*, a two-part test is "employed to determine whether a defendant was denied the effective assistance of counsel." *Meresal*, 2014 Guam 13 ¶ 44 (citing *People v. Ueki*, 1999 Guam 4). To prove ineffective assistance of counsel, the defendant "must establish that counsel's performance was deficient; then he must show that such deficiency prejudiced his defense so as to deprive him of a fair trial. The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at ¶ 45 (quoting Strickland, 466 U.S. at 686-87).

**A. Photographic Lineup**

Petitioner first argues that he suffered from ineffective assistance of counsel because his trial counsel failed to move to exclude the unduly suggestive photographic lineup. (Am. Petition at 24-31). Respondent opposes, arguing that the victim's out-of-court identification was not unduly suggestive. (Opp'n at 15-17, Jan. 5, 2022). Respondent also sets forth that the Supreme Court of Guam "carefully reviewed the photo array to determine whether it was impermissibly suggestive and found that it was not" on Petitioner's appeal. *Id.* at 16.

The first issue before the Court is whether the photographic lineup was unduly suggestive. To determine whether a defendant's due process rights have been violated where a witness makes an in-court identification stemming from previous exposure to a suggestive photographic array, the evidence must show that "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *People v. Diego*, 2013 Guam 15 ¶ 14 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "[U]nnecessary suggestiveness alone does not require exclusion of evidence. In that instance, the central question is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Id.* at ¶ 15 (citing *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972) (internal quotation marks omitted). "[T]he same standard applies for determining the admissibility of testimony

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 5 of 15

concerning the out-of-court identification itself." *Id.* at ¶ 16 (citation omitted). "The application of this rule depends on the circumstances of each case, including whether the suggestiveness made the defendant 'stand out' from others in the lineup and whether the identification procedure was unnecessary." *Id.* (citation omitted).

About a week and a half after the incident, the victim, A.M. returned to the police station on two separate occasions to identify a possible suspect in a "show-up," but the police did not have the right person on either occasion. A.M. was told by the officer to walk by and look at the suspect while he was talking to a police officer. Each time, she saw the suspect for only a few seconds and the man was about 15-20 feet away. The officer did not tell her that the possible suspects were bus drivers, and they were not wearing uniforms. A.M. told the police that the suspects were too dark and that she told the police that the person who attacked her was "white."

GPD Officer Jason M. Dodd was asked to prepare a photographic lineup. Officer Dodd prepared the photographic lineup by first obtaining a recent photo of the suspect in the case and that he then chose five photographs from the mugshot processing photographs of individuals similar in appearance to the suspect in the first photograph. Officer Dodd was not given a physical description of Petitioner, only his photo. Officer Dodd testified that the photos are cropped to approximately 2" by 2" in size and arranged in two lines of three photos prior to printing. Petitioner's photo in the photo array was labeled number 3. Officer Dodd testified that when a photo lineup is shown to someone, a photographic lineup admonition form which gives instructions on how to view the form and after the viewing is complete, the viewer puts a description or explanation of how one of the photos were chosen or if he or she did not choose a person from the lineup, why he or she did not. Officer Dodd believed that this process was followed in this case but he was not present when the photo lineup was shown to A.M.

On August 21, 2007, a GPD officer brought the photographic array to the Reef Hotel for A.M. to view. The officer conducting the array asked A.M. if she knew anyone in the pictures, to which she told him she knew number 3. A.M. made a written statement immediately thereafter, writing "I know his face. It's number 3. Because I met him 3 ~ 5 times and I talked

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 6 of 15

with him at least 1 hour." (ER0202). The Government did not call the GPD Officer who was administered the photographic lineup with A.M. to testify at trial.

At trial, A.M. was unable to identify Petitioner in the courtroom as her attacker, however, while she was still on the witness stand, she was able to immediately select his picture from the same photo array she previously used to identify him shortly after the attack three years earlier. One of Petitioner's supervisors during August 2007, Art Salomes, testified that Petitioner had shorter hair during trial compared to when he was working for LamLam Tours and another, Francisco Guerrero, testified that Petitioner had been heavier and that he had a mustache and longer hair in 2007.

On appeal, the Supreme Court acknowledged that "[w]hile Diego did have the lightest complexion and the contrast may have been darker on two of the photos, we cannot say that these small differences rendered the photo array impermissibly suggestive." *People v. Diego,* 2013 Guam 15 ¶ 19. "Each of the individuals in the array had round faces, short hair, and thin moustaches. Additionally, the photographs were uniform in size, shape, and background and included no identification other than numbers." *Id.* at ¶ 18. As to the photos themselves and the layout, the Court does not find any reason to deviate from the Supreme Court's holding that the photo array itself was not impermissibly suggestive. Petitioner agues, however, that "the Court did not address the suggestiveness of the GPD Officer directly stating to [A.M.] that a suspect was among the photographs presented in the lineup." (Am. Petition at 28).

On cross-examination, the following exchange took place between defense counsel and A.M.:

Q: And did the officer tell you that there was a suspect included in those pictures?

A: Yes.

Q: He did?

A: He ma - -

The first officer told me to look at the picture, and then they ask me if I know any guy in this picture.

Q: And what did you say?

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 7 of 15

A: I told him . . . told him that that's the bus driver, the number 3.

(ER0090). Petitioner sets forth that "the photographic lineup should have been the subject of a motion *in limine,* at which time Mr. Warfield could have subpoenaed and examined the police officers involved in the photo lineup, and investigated the full extent of the suggestive statements made to [A.M.]. Mr. Warfield's failure to move for the exclusion of this evidence *in limine* was not based on strategy, and resulted in a complete failure to investigate the suggestive circumstances of the photo lineup." (Am. Petition at 30).

As noted by the Supreme Court on appeal, "[a]lthough initially, A.M. responded "Yes" to defense counsel's question, when he followed up on her response, she did not confirm that the officer indeed indicated that one of the six photographed individuals was a suspect." *People v. Diego*, 2013 Guam 15, fn. 4. The Supreme Court, in considering the testimony as a whole, did "not find [A.M.'s] initial one-word response to be conclusive evidence that the police officer in fact informed A.M. that one of the individuals was a suspect in the case." *Id.* Petitioner, in acknowledging this explanation by the Supreme Court, nonetheless asserts that that "[t]he fact remains that nothing in the factual record contradicts the victim's testimony that she was told that the perpetrator was included in the lineup she was shown." (Reply at 5 fn. 2).

To prove prejudice under *Strickland*, Petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. Even when the police use such a procedure . . . the suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012) (citations omitted). The "Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification." *Id.* at 239 (citation omitted). "Reliability of the eyewitness identification is the linchpin of that evaluation. . . . Where the indicators of a witness's ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed." *Id.* (alterations and citations omitted). "External suggestion is hardly the only factor that casts

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page **8** of **15**

doubt on the trustworthiness of an eyewitness' testimony. . . . many other factors bear on the likelihood of misidentification – for example, the passage of time between exposure to and identification of the defendant, whether the witness was under stress when he first encountered the suspect, how much time the witness had to observe the suspect, how far the witness was from the suspect, whether the suspect carried a weapon, and the race of the suspect and the witness." *Id.* at 243-44.

Here, A.M. was not under stress when she first encountered the suspect. She was at McDonalds in Tumon waiting for her friend and spoke with the suspect while she was waiting for her food and for another thirty to thirty-five minutes prior to getting on the bus. She therefore had ample opportunity to view the suspect and inside in a lighted area. A.M. testified that she recognized the suspect as one of the bus drivers on the red trolley route. At the time of the incident, A.M. had been on Guam for almost six months working and staying at the Guam Reef Hotel and taking English classes several times a week at the Fiesta Hotel.[6] When they got on the bus, A.M. and the bus driver were the only ones on the bus and she sat down behind the driver's seat. A.M. made her identification of Petitioner in the photo array a week and a half or so after the incident. Although this identification was not immediately after the incident, the Court does not find that a week and a half to be a significant amount of time after the fact to call the identification's accuracy into question. *See, e.g., Neil v. Biggers,* 409 U.S. 188, 201 (1972) (permitting an identification to go to the jury even when seven months separated the crime from the confrontation). No weapon was alleged to have been used, so A.M.'s focus would not have been on a weapon instead of the suspect at the time of the incident. The Court acknowledges that A.M. and the suspect were of different races.[7] However, the Court finds that in considering all factors as a whole, A.M.'s ability to make an accurate identification was not outweighed by any possible law enforcement suggestion.

---

[6] At trial, A.M. testified that at the time of the incident, she was a 20-year-old Japanese student on Gaum for a one-year internship. A.M. started working at the Guam Reef Hotel in Tumon on February 17, 2007 and would often take LamLam Tours red trolley bus to get to her English classes at the Fiesta Hotel.

[7] The Court further addresses the issue of cross-racial identification *infra.*

*Diego vs. Camacho*
SP0110-17
Decision and Order

Petitioner further argues that the "effect of the photo lineup on the jury was amplified as well by the complete lack of physical evidence – DNA evidence, bodily fluids, or even the victim's clothing – for the jury to turn to in determining guilt. Petitioner's counsel was derelict in his duties to highlight this lack of physical evidence, and the record is devoid." (Am. Petition at 30-31). According to Petitioner, "[t]he record does not illuminate any effort by either the government or defense counsel to address the missing clothing of the complaining witness." (Am. Petition fn. 6).

As to the issue of any missing clothing, attached to Respondent's Opposition are excerpts from a GPD case report indicating four items of clothing were confiscated from A.M. on August 13, 2007, a GPD custody receipt for one black medium sized bra with golden flowers; one black medium sized panty with golden flowers; one turquoise colored small "O'Neil" T-Shirt; and one blue "love boat" jeans style shorts; along with a lab report indicating semen was not detected on any of the four items, documents which were stamp received by Alternate Public Defender's Office on November 7, 2008 and May 14, 2010. (Opp'n, Ex. A). Thus, as the record indicates, information about the clothing was provided to defense, and the Court cannot say defense counsel acted deficiently as to any "search" for the clothing. Further, defense counsel highlighted the fact that no physical evidence was found on the bus where the incident occurred during his closing argument. *See* Jury Trial Tr. (Aug. 26, 2010) at 46: 4-18. Therefore, the Court does not find that Defendant suffered from ineffective assistance of counsel as to any failure to move to suppress the photographic lineup pre-trial.

**B. Cross-Racial Identification Instruction**

Petitioner next argues that his trial counsel was ineffective because he failed to request a jury instruction regarding eyewitness testimony and offer arguments regarding the inherent susceptibility of cross-racial identifications. Petitioner argues that because his sole defense at trial was one of mistaken identity, that "should have triggered a key jury instruction regarding factors to consider in proving identity by eyewitness testimony, especially because the complaining witness, [A.M.], failed to identify Mr. Diego as her assailant during the trial." (Am. Petition at 32). Petitioner further argues that his counsel "did not identify, attempt to

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page **10** of **15**

argue, or offer evidence (such as expert testimony) engaging the inherent susceptibility of cross-racial eyewitness identifications." *Id.* at 34. Petitioner sets forth that his counsel's "failure to request jury instructions specific to Petitioner's only defense is objectively unreasonable and deficient, within the meaning of *Strickland*" as there was "no strategic or tactical reason" for his failure to do so. *Id.* at 35. Respondent argues in opposition that because other evidence supported the reliability of the victim's out-of-court identification, an instruction on the inherent unreliability of cross-racial identification was unwarranted. (Opp'n at 20).

"The central premise of cross-race bias, the impetus for giving a cross-racial identification instruction, is that people are better able to remember *faces* of their own race than those of a different race." *State v. Allen*, 294 P.3d 679, 686–87 (Wash. 2013), *as amended* (Feb. 8, 2013) (emphasis in original). Although defense counsel may not have specifically brought up the issue of cross-race identification or requested an instruction on eyewitness identification, the Court finds that the jury's attention was adequately drawn to any issues regarding eyewitness identification at trial through closing arguments of defense counsel, the cross-examination of prosecution witnesses, and the general instructions given by the court. During closing arguments for example, defense counsel addressed the issue of identification when A.M. looked at the photo array in 2007 with Officer Morrison and her subsequent written statement along with the description she gave to the police. (Jury Trial Tr. (Aug. 26, 2010), 32: 10 – 33:5; 33: 13 – 20; 34: 23 – 45: 9). At trial, the court gave the following instruction on the credibility of witnesses:

> In deciding what the facts are, you must decide what testimony to believe and what testimony not to believe. You may disbelieve all or any part of any witness' testimony. In making that decision, you may take into account a number of factors, including the following:
>
> 1. Was the witness able to see, or hear, or know the things about which that witness testified?
>
> 2. How well was the witness able to recall and describe those things?
>
> 3. . . . What was the witness' manner while testifying?

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 11 of 15

4. Did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case?

5. How reasonable was the witness' testimony considered in light of all the evidence in the case?

6. Was the witness' testimony contradicted or supported by what the witness had said or done at another time, or by the testimony of other witnesses, or by other evidence?

In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or with only a small detail.

The weight of the evidence presented by each side does not necessarily depend on the number of witnesses testifying on one side or the other. You must consider all the evidence in the case, and you may decide that all testimony of a smaller number of witnesses on one side has greater weight than that of a larger number on the other side.

(Jury Trial Tr. (Aug. 27, 2010), 20:22 – 22:4). The jury was also instructed that the Government must prove Petitioner's guilt beyond a reasonable doubt. Taken together, the jury was charged with deciding whether the Government proved beyond a reasonable doubt that A.M. correctly identified Petitioner as the man who assaulted her.

Further, as pointed out by the Supreme Court on appeal, "[a]lthough A.M. was unable to point out [Petitioner] as her attacker in open court, her photo array identification of [Petitioner] was unequivocal in both instances" (at the Reef Hotel with GPD and at trial). *People v. Diego*, 2013 Guam 15 ¶ 33. A.M. also testified that she told the police that "I know the bus driver and . . . about how he looks. . . . He had a mustache here and also he's tying his hair on here, and he -- he's kind of fat." (Jury Trial Tr. (Aug. 23, 2010) at 62: 16-21). When asked if the bus driver tied his hair in the back, A.M. testified "yes." *Id.* at 62: 22-23.

Furthermore . . . on the night of the incident, Diego was assigned to the bus A.M. testified was used in the attack. A.M. testified the bus she was attacked on was Sandcastle 4, and a supervisor testified Diego was assigned to that bus on the night of the incident. Diego was also fired from his job as a bus driver because he used a bus 'for other than its intended purpose' and was dishonest. In addition, one witness testified that Diego had a thin mustache at the time of the incident

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page **12** of **15**

and had lost a little weight since then. The jury could have used these facts to determine the identity of A.M.'s attacker in light of her failed in-court identification.

*People v. Diego*, 2013 Guam 15 ¶ 33. The Court finds that these additional facts presented to the jury lessened any danger of misidentification. Therefore, the Court does not find that the first prong of *Strickland* has been met and will not grant the Petition on that ground.

**C. Rape Crisis Center Doctor's Testimony**

Lastly, Petitioner argues that his trial counsel was ineffective because he failed to request a jury instruction requiring the physician's impressible vouching for the complaining witness. (Am. Petition at 35-36). Respondent argues in opposition that Dr. Weare's testimony did not amount to vouching. (Opp'n at 21-22).

After A.M. reported her assault to the police, she was taken to the Healing Hearts Rape Crisis Center and underwent a forensic examination by Dr. William W. Weare ("Dr. Weare"). A.M. told Dr. Weare details of the assault: that she missed meeting a friend at McDonalds, it started to rain, and that a bus driver that she knew from before offered her a ride home in his bus but instead took her to a hotel parking lot, pulled the curtains down, forced her to the back of the bus and sexually assaulted her. A.M. also told Dr. Weare that her assailant ejaculated outside of her body and that she showered after. Dr. Weare testified that because she showered, "there's no residual body fluids that are on the outside that you're likely to find, and it, you know, any superficial, muddy scraps or anything like that is going be removed." (Jury Trial Tr. (Aug. 24, 2010), 108: 14-17). A.M. described her assailant to Dr. Weare as "possibly Chamorro, light complected, overweight, about 5-foot/6, with a mustache." *Id.* at 119: 7-9. Dr. Weare's examination revealed subtle findings consistent with A.M.'s story, namely, evidence of vaginal and rectal abrasions and shoulder pain. Dr. Weare's "diagnostic impression was this was an adult female with a history of forcible sexual assault and equivocal physical findings." *Id.* at 110: 9-11. The challenged testimony occurred during cross-examination where the following exchange took place between defense counsel and Dr. Weare:

Q: Now, and you eluded to this when Mr. O'Mallan asked you about making a finding, you said, "like the majority of these cases," and then you said, "unless

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page **13** of **15**

there's a smoking gun," indicating there was no assault, then most of the time your findings are going to be that - - or, your findings are going to be consistent with the repot, unless there's a smoking gun?

A: Well, what we do is we get the history, we do the exam, and we try to put it all together, and we say, "Does it fit or does it not fit," and in this case, it fit."

Q: And what you mean by fit is, what you view is consistent with her oral history?

A: That's correct.

Q: So, you can't - - Strike that.
In most cases, you would not be able to rule out sexual assault; is that an accurate statement?

A: That's probably not an accurate statement because obviously I wasn't there, I couldn't tell, but we would be relying on what the patient tells us obviously, and most of the time the patients are pretty truthful in what they tell us. This is a very emotional time for them and, you know, with 30 years of experience you kind of learn to assess what's going on, what is it, and mostly there's some judgment involved here.

Q: Some judgment, so it's subjective?

A: Yeah, it's subjective based on experience, yes.

(Jury Trial Tr. (Aug. 24, 2010), 112: 8 – 113: 7).

The Court agrees with Respondent that Dr. Weare "merely made a general observation about Healing Hearts patients based on his experience working there over many years." (Opp'n at 21). Dr. Weare never directly stated that A.M. is believable. *See, e.g., Garber v. State,* 152 N.E. 3d 642 (Ind. 2020) (holding that the ER physician's statement "For the most part, I feel like people are honest. Sometimes I ask them questions about drug abuse or alcoholism or their sexual preferences and they're very honest. I don't think that there's a reason really for people to lie when they're seeking medical care" did not constitute impermissible vouching because the physician "did not opine that [the victim] was telling the truth, [but was] offering only a general observation on how emergency-room patients behave based on her experience."). The Court finds that Dr. Weare's testimony during cross examination did not constitute improper

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 14 of 15

vouching. Accordingly, Petitioner was not denied effective assistance of counsel by trial counsel's failure to object to Dr. Weare's testimony.

## CONCLUSION

For the foregoing reasons, the Court hereby DENIES Petitioner's Amended Petition for Writ of Habeas Corpus. The Court, however, orders that an Amended Judgment be issued in CF0398-07 reflecting the proper charges Petitioner was convicted of at trial.

IT IS SO ORDERED this 2nd day of ~~November~~ December, 2022.

_____
HONORABLE VERNON P. PEREZ
Judge, Superior Court of Guam

*Diego vs. Camacho*
SP0110-17
Decision and Order

Page 15 of 15